UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                                              Case No. 07-40288-608

Gus Benjumen,                                                          Chapter 7

                     Debtor.
------------------------------------------------------------x
Gus Benjumen,

                     Plaintiff,


        -against-                                                    Adv. Pro. No. 07-1456-608


AES/Charter Bank, AES/Key Corp. Trust,
AES/NCT, Bank of Boston, City College of
New York/City University of New York,  United
States Department of Education, Wells Fargo,
City University of New York, The Education
Resources Institute,

                     Defendants.
------------------------------------------------------------x



<u>DECISION</u>


Appearances:

Amanda R. Raboy, Esq.                              John Vagelatos, Esq.
Covington & Burling, LLP                            United States Attorney's Office
The New York Times Building                       271 Cadman Plaza East
620 8th Avenue                                          Brooklyn, NY 11201
New York, New York 10018                         Attorney for Defendant, United
Attorney for Plaintiff, Gus Benjumen           States Department of Education


Roderick Arz, Esq.                                       Magdeline D. Coleman, Esq.
NYS Office of the Attorney General              Buchanan Ingersoll & Rooney, P.C.
120 Broadway - 24th Floor                          Two Liberty Place
New York, NY 10271                                    50 South 16th Street
Attorney for Defendant, City College of       Suite 3200
New York/City University of New York          Philadelphia, PA 19102
                                   Attorney for Defendant, The Education
                                   Resources Institute


                    CARLA E. CRAIG
            Chief United States Bankruptcy Judge

This matter comes before the Court on the motions for summary judgment of the Defendants, The Education Resources Institute ("TERI"), City University of New York ("CUNY"), and the United States Department of Education ("DOE"), in this adversary proceeding brought by the Plaintiff, Gus Benjumen ("Mr. Benjumen" or "Plaintiff"), seeking discharge of his student loans based on "undue hardship" pursuant to of 11 U.S.C. §523(a)(8). For the reasons set forth below, the motions for summary judgment are denied.

## Jurisdiction

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 1334, 11 U.S.C. § 1142, and the Eastern District of New York standing order of reference dated August 28, 1986.  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## Facts

The following facts are undisputed.

The Plaintiff, who is currently 64 years old, was diagnosed with bipolar disorder no later than 1992.  From 1996 through 2005, and during the fall 2006 semester, he was enrolled as a full-time student at the City College of New York ("City College"), a senior college of CUNY, except for one semester in 2005, in which he attended Kingsborough Community College.  The Plaintiff financed his education with student loans, which were in amounts greater than required to pay for tuition, as he also used them to cover living expenses for himself and his family.[1]  The

---

[1] According to the Plaintiff's statement of facts, the loans, with accrued interest, totaled $166,363.00 as of the petition date.

Plaintiff testified that he received his undergraduate degree with honors from City College in February 2000. (Benjumen Tr.,[2] 21:14-16.)

From 2000 through 2006, the Plaintiff was employed by the New York City Department of Education (the "NYCDOE") as an occasional per diem substitute teacher. While substitute teaching for the NYCDOE, the Plaintiff enrolled as a full-time masters student in the evenings at City College, in the International Relations Masters Program. He further testified that in 2002, after experiencing academic trouble in school, he was evaluated by City College's Psychological Center, and was granted academic adjustments under the Americans with Disability Act of 1990 and Section 504 of the Rehabilitation Act of 1973 and amended Section 508 of the Rehabilitation Act. (Benjumen Tr., 26:15-22; 27:1; 28:5.) Plaintiff testified that despite completing the required courses for a Master's Degree in 2006, his cumulative GPA was below the minimum to graduate, and he discontinued his studies. (Benjumen Tr., 43: 4-22.)

In early 2006, he was appointed by the NYCDOE to a position as a substitute teacher at Grady High School in Brooklyn, New York. On May 8, 2006, the Plaintiff quit his position at Grady High School, which resulted in an unsatisfactory rating on his record by the NYCDOE. The Plaintiff claims that the unsatisfactory rating prevents him from obtaining a new teaching position with the NYCDOE. Through his union representative, the Plaintiff appealed his unsatisfactory rating. By letter dated January 29, 2009, he was informed that his appeal was denied (the "Denial Letter"). On December 10, 2008, prior to receiving the Denial Letter, the Plaintiff testified at his deposition that if his appeal of his unsatisfactory rating were successful,

_____

[2]Citations to "Benjumen Tr." refer to the transcript of Plaintiff's deposition testimony given on December 10, 2008.

and he obtained reinstatement, he intended to resume work as a teacher.  (Benjumen Tr., 9:2-4; 77:14-17.)

On September 1, 2007, the Plaintiff received his full-time teaching license.  Despite sending job application letters and resumes to approximately 100 schools in and around New York City (Benjumen Tr., 68:9-70:3.), he has not been able to obtain a position.  The Plaintiff did not call any school to follow up on the status of his job applications.  He testified at his deposition that he expects to continue his search for employment as a teacher in the New York school system.  (Benjumen Tr., 73:14-19.)  The Plaintiff has not sought employment outside the field of teaching since 2000.

The Plaintiff testified that on June 21, 2006, he went to the emergency room at Coney Island Hospital and was admitted to the psychiatric unit.  (Benjumen Tr., 43:23-25.)  He also testified that he suffers from an enlarged heart and high blood pressure.  (Benjumen Tr., 9:2-4; 77:14-17.)  The Plaintiff has applied for Social Security disability benefits, but the Social Security Administration ("SSA") denied the Plaintiff's application.

On January 19, 2007, the Plaintiff filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.  On April 24, 2007, the Plaintiff received a discharge of his debts.  On August 13, 2007, the Plaintiff commenced this adversary proceeding, seeking a determination that his student loans were dischargeable under 11 U.S.C. §523(a)(8). TERI, CUNY, and DOE filed Answers and Affirmative Defenses to the Complaint, and subsequently filed the instant motions for summary judgment, asserting that the Plaintiff could not prove that repayment of the loans would create an undue hardship for him as required by 11 U.S.C.

§523(a)(8).  The Plaintiff filed a response *pro se* and an amended response through *pro bono* counsel.

In connection with this litigation, the Plaintiff was evaluated by  Mark V.F. Johnson, Ph.D. ("Dr. Johnson"), a psychologist and certified rehabilitation counselor specializing in the evaluation, counseling, job placement and training of persons with disabilities.  Dr. Johnson performed an interview and several tests to assess Mr. Benjumen's capacity to return to work.

Standard for Summary Judgment

Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue of material fact to be tried.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A fact is considered material if it "might affect the outcome of the suit under the governing law." Id. at 248.  No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citation omitted).  On the other hand, if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (citation omitted).  "The non-moving party must show that there is more than a metaphysical doubt regarding a material fact and may not rely solely on self-serving conclusory statements." In re Jarrell, 251 B.R. 448, 450-451 (Bankr. S.D.N.Y. 2000).

Here, certain material facts, as set forth below, are in dispute, and summary judgment must therefore be denied.

Discussion

Dischargeability under 11 U.S.C. §523(a)(8)

The Bankruptcy Code excepts from discharge any debt insured or guaranteed by a governmental unit as an educational benefit, unless the debtor can show that repayment of the debt will impose an undue hardship on the debtor and the debtor's dependents.  11 U.S.C. §523(a)(8).  To determine whether a debtor will suffer "undue hardship", the Second Circuit delineated a three-prong test in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395, 396 (2d Cir. 1987) (the "Brunner Test").  Id. at 396.   To obtain a student loan discharge, the debtor must prove

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

Id.

The debtor must prove all three prongs by a preponderance of the evidence in order to establish undue hardship.  King v. Vermont Student Assistance Corp. (In re King), 368 B.R. 358, 367 (Bankr. Vt. 2007).  In the context of these motions for summary judgment, therefore, the Defendants need only show an absence of evidence to support the Plaintiff's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986) (when the nonmoving party will bear the ultimate burden of proof at trial, the moving party's burden is satisfied by showing an absence of

evidence to support an essential element of the nonmoving party's claim). "The determination of undue hardship is case-and fact-specific." <u>King</u>, 368 B.R. at 367; <u>Jackson v. Educ. Res. Inst. (In re Jackson)</u>, 2007 Bankr. LEXIS 2713, *14 (Bankr. S.D.N.Y. 2007) ("The basic analysis of [undue hardship] is a mixed question of law and fact, which requires courts to consider the unique or extraordinary circumstance of a particular situation on a fact-intensive, case-by-case approach.").

If it is determined that the Plaintiff has submitted evidence to support his claim, summary judgment is not appropriate, as the court must make a factual determination, and weigh the evidence submitted by both parties to determine whether repayment of the loans will result in an undue hardship. <u>Wetzel v. New York State Higher Educ. Services Corp.</u>, 213 B.R. 220, 225 (Bankr. N.D.N.Y. 1996) (whether repayment of loans will result in hardship is a factual question determined by the weighing of the evidence presented). The Defendants do not contest that the Plaintiff has satisfied the first prong of the <u>Brunner</u> Test. Therefore, only the second and third prongs are at issue on this motion.

## 1. The Second Brunner Prong-Future Prospects

The second prong of the <u>Brunner</u> Test requires that the Plaintiff show that his current financial difficulties will likely persist for the life of the repayment period of the student loans. <u>Brunner</u>, 831 F.2d at 396. Under this prong, the Plaintiff must show "unique and exceptional circumstances, beyond [his] control...that would prevent future employment and the ability to repay the debt." <u>Wells v. Sallie Mae (In re Wells)</u>, 380 B.R. 652, 660-661 (Bankr. N.D.N.Y. 2007); <u>Mosley v. Gen. Revenue Corp. (In re Mosley)</u>, 330 B.R. 832, 840 (Bankr. N.D. Ga. 2005) ("'Undue hardship' contemplates unique, extraordinary, or severe circumstances, particularly

under the second prong of the <u>Brunner</u> Test, and thus courts must determine undue hardship on a case-by-case basis.").  Illness or disability have been found to be exceptional circumstances justifying a finding of undue hardship.  <u>Jackson</u>, 2007 Bankr. LEXIS 2713 at *17 (<u>citing</u> <u>King</u>, 368 B.R. at 370.)

A. <u>Defendants argue that Plaintiff has not established that bipolar disorder is untreatable</u>.

The Defendants argue that a reasonable fact finder cannot conclude that Mr. Benjumen's current state of affairs will likely persist, because he has failed to present evidence that his medical condition is not treatable, and because he does not treat his bipolar disorder with medication.  The Defendants cite the deposition testimony of the Plaintiff's expert, Dr. Johnson, who testified that for persons suffering from bipolar disorder, medication provides the best chance for a productive life and family relationships.  (Johnson Tr.,[3] 42:6-7; 161:21-25; 162:1-4.)  The Defendants also point to the report of a psychiatrist at Coney Island Hospital (the "Coney Island Medical Report"[4]), stating that the Plaintiff refused medications recommended and prescribed by several physicians.  Additionally, the Defendants cite to <u>Nash v. Connecticut Student Loan Fndtn. (In re Nash)</u> 446 F.3d 188, 193 (1st Cir. 2006), where the court took judicial notice of the National Institute of Mental Health's conclusion that "people with bipolar disorder may lead productive lives with proper treatment."

In <u>Nash</u>, the First Circuit upheld the Bankruptcy Court's finding that the debtor did not carry her burden of proving that her unemployability would likely persist because the debtor, a 41 year old woman, diagnosed with bipolar disorder and no other ailments, did not produce any

---

[3] Citations to "Johnson Tr." refer to the transcript of Dr. Johnson's deposition testimony given on December 19, 2008.

[4] The Coney Island medical Report was submitted by both parties as Exhibits.

evidence at trial as to her long term prognosis, and in particular, whether the medication she was already taking would improve her condition over time.  Id. at 192-193.  The Defendants argue that Mr. Benjumen likewise cannot satisfy the second prong of the Brunner Test because he does not take medication, and therefore no inference can be made regarding his future employability.

Nash is distinguishable from the instant case.  There, the court's finding of insufficient evidence to show that the debtor's unemployability would likely persist, was not on a motion for summary judgment, but after a trial on the issues underlying the Brunner prongs.  Furthermore, the debtor in Nash submitted Disability Deferment Request Forms signed by one of her physicians as evidence of her bipolar diagnosis, which included a "notation that 'this disability is temporary.'"  Id.  No such evidence that the Plaintiff's condition is temporary has been submitted here.  Finally, unlike the debtor in Nash, Mr. Benjumen, at 64, is near retirement age. Mr. Benjumen, moreover, has offered expert testimony as to the improbability of future employment given his condition and age.

Furthermore, Mr. Benjumen testified at his deposition that he does not always take medications prescribed to him for his bipolar disorder because of side effects associated with high blood pressure.  (Benjumen Tr., 79:3-4.)  This is consistent with his deposition testimony that he suffers from an enlarged heart and high blood pressure.  (Benjumen Tr., 9:2-4; 77:14-17.) The Coney Island Medical Report, which noted that Mr. Benjumen was taking medication for high blood pressure, substantiates Mr. Benjumen's deposition testimony.  It is not disputed that the Plaintiff has been diagnosed with bipolar disorder, has an enlarged heart, and high blood pressure.  Moreover, Mr. Benjumen testified at his deposition that he is in fact taking two psychiatric medications for his "maniac effective depressive disorder", and that he sees a

psychiatrist, Dr. Stern, monthly to fill the two prescriptions.  (Benjumen Tr., 9:18-24; 82:1-9.)

This record reflects multiple factual issues, such as whether Mr. Benjumen is taking

psychiatric medications and whether his ability to do so is limited by other health problems, and

whether, even if his disorder were treated, he would be likely to obtain future employment given

his age and employment history.  It should be noted that the Defendants have not offered any

expert or other evidence showing that Mr. Benjumen's level of functioning or employability

would in fact improve with medication.

B. Medical evidence and the admissibility of Dr. Johnson's testimony.

The Defendants argue that Dr. Johnson is not qualified to offer an expert opinion

regarding the Plaintiff's bipolar disorder.  The record is clear, however, that Dr. Johnson's

opinion is not offered with respect to the Plaintiff's medical condition and prognosis, but rather,

to show that his employment prospects are unlikely to improve given the Plaintiff's age, bipolar

disorder, and present level of functioning.  Moreover, courts have held that medical testimony is

not required to satisfy the second prong of the Brunner Test, especially where the debtor (like

Mr. Benjumen) has scarce financial resources.

> Requiring that a bankruptcy debtor provide corroborative
> medical evidence beyond the debtor's own testimony in
> order to sustain the evidentiary burden for a hardship
> discharge of a student loan on medical grounds is likely to
> prevent *pro se* debtors from receiving the relief to which
> they are entitled because they 'cannot afford to hire medical
> experts to testify to the effect of their disease on their
> earning capacity.'

Jackson, 2007 Bankr. LEXIS 2713 at *20 (quoting Doherty v. United Student Aid Funds (In re

Doherty), 219 B.R. 665, 669 (Bankr. W.D.N.Y. 1998); Dewey v. Sallie Mae, Inc. (In re Dewey),

381 B.R. 681, 684 (Bankr. W.D. Tenn. 2008) (proof that disability is not likely to improve

during the repayment period need not take the form of medical testimony); <u>Barrett v. Sallie Mae Servicing (In re Barrett)</u>, 339 B.R. 435, 443 (Bankr. N.D. Ohio 2004) (corroborating evidence is not necessary where credible testimony is given by Plaintiff); <u>but see</u> <u>Congdon v. Educ. Credit Mgmt. Corp. (In re Congdon)</u>, 365 B.R. 433, 444-445 (Bankr. D. Vt. 2007) ("[W]hen the condition in issue is of a psychiatric or psychological nature, the plaintiff is required to offer, at the very least, corroborating psychological and/or medical documentation, if not persuasive expert testimony, that [his] disorder is expected to persist.").

Mr. Benjumen offers as evidence Dr. Johnson's opinion in support of his contention that his current financial state of affairs, and inability to secure employment, will persist throughout a significant portion of the repayment period.  Dr. Johnson testified that given Mr. Benjumen's age in conjunction with his present level of functioning, it is highly unlikely that his vocational prospects will improve.  (Johnson Tr., 36:14-17; 157:3-11.)

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If a specific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The proponent of expert testimony bears the burden of establishing admissibility under Rule 702 by a preponderance of the evidence.  <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,

509 U.S. 579, 592-593 n.10 (1993). In "interpreting Rule 702 in <u>Daubert</u>, the Supreme Court rejected the traditional <u>Frye</u> rule, under which courts required that a scientific theory be generally accepted by the scientific community in order to be admissible." <u>Amorgianos v.</u> <u>AMTRAK</u>, 303 F.3d 256, 265 (2d Cir. 2002) (citations omitted); <u>Daubert</u>, 509 U.S. at 587-588 (holding that the more liberal Federal Rules of Evidence supercede <u>Frye</u>, which "predated the Rules by a half a century"). Under <u>Daubert</u>, trial courts are charged with a "gatekeeping" function to ensure that scientific expert testimony is reliable and "relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597. This gatekeeping function has since been extended to non-scientific expert testimony to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co. V. Carmichael</u>, 526 U.S. 137, 147-148 (1999). In determining whether an expert is qualified to offer opinion testimony under Rule 702, "[a] court must take into consideration the expert's background and practical experience." <u>Bacardi & Co. V. New York Lighter Co.</u>, 2000 U.S. Dist. LEXIS 3547, *6 (E.D.N.Y. Mar. 15, 2000) (<u>citing</u> <u>McCullock v. H.B. Fuller Co.</u>, 61 F.3d 1038, 1043 (2d Cir. 1995).

Dr. Johnson is a licensed psychologist and a certified rehabilitation counselor, specializing in vocational rehabilitation. (Johnson Tr. 10:14-17; 11:9-16; 19:16; 24:14.) <u>Compare</u> <u>Elcock v. Kmart Corporation</u>, 233 F.3d 734, 742 (3d Cir. V.I. 2000) (noting that district court had qualified a vocational expert who was not certified nor had any formal training in vocational rehabilitation therapy, relying "heavily on the fact that a formal degree in vocational rehabilitation therapy was not available when [the witness] attended school"). Dr.

Johnson has a Ph.D. in counseling psychology from New York University. (Johnson Tr., 7:6-7.) He was employed as a vocational counselor at the Rusk Institute of Rehabilitation Medicine for ten years, and is currently employed at Comprehensive Rehabilitation Consultants, Inc., since 2007, where he performs vocational psychological evaluations for Workman's Compensation as well as for one of the Defendants, DOE, and performs vocational and educational services for individuals with disabilities. (Johnson Tr., 25:6-8, 26:17-21; 27:4-9.)

Dr. Johnson's testimony regarding Mr. Benjumen's vocational prospects and his employability is well within his range of expertise and supports the Plaintiff's position. King, 368 B.R. at 365 (court admitted, for purposes of an undue hardship determination, the expert testimony of a rehabilitation counselor and vocational evaluator offered by the defendant, regarding the feasibility of the debtor finding employment, and his ability to return to work given his psychological difficulties). The fact that Dr. Johnson takes the Plaintiff's bipolar diagnosis and age into account in evaluating his employability, does not transform his opinion into medical testimony that he would be unqualified to give; rather, it serves to reinforce the credibility of his expert opinion as a vocational counselor. Compare King, 368 B.R. at 372. (court gave little weight to vocational evaluator's testimony because it failed to consider the debtor's "actual and undisputed symptoms.").

The Defendants seek to exclude Dr. Johnson's opinions on grounds that they are not based on proper methodologies and therefore, not reliable. In Daubert, the Supreme Court outlined four factors a court may consider in determining reliability under Rule 702:

> (1) whether the theory or technique relied on has been tested;
> (2) whether the theory or technique has been subjected to
> peer review and pubication; (3) whether there is a known or
> potential rate of error and the existence and maintenance of

> standards controlling the technique's operation in the case of
> a particular scientific technique; and (4) whether the theory
> or method has been generally accepted by the scientific
> community.

Donnelly v. Ford Motor Co., 80 F. Supp. 2d 45, 48 (E.D.N.Y. 1999); Daubert, 509 U.S. at 593-

594.

The Daubert factors do not constitute a "definitive checklist or test". Daubert, 509 U.S.

at 593. The test of reliability under Rule 702 remains a "flexible" one: "Daubert's list of specific

factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law

grants a district court the same broad latitude when it decides *how* to determine reliability as it

enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 141-142. In

certain cases, "reliability concerns may focus [more] upon personal knowledge or experience" of

the expert. Id. at 150.

The Defendants attack the reliability of Dr. Johnson's testimony, arguing that Dr.

Johnson: (1) did not perform a full vocational evaluation on the Plaintiff; (2) did not examine

local employment conditions; (3) did not assess what other types of employment might be

available to the Plaintiff; and (4) did not reference the U.S. Department of Labor's Dictionary of

Occupational Titles. The Defendants fail, however, to provide any authority that requires the

exclusion of Dr. Johnson's testimony based on these objections.

Dr. Johnson testified that he based his opinion on a review of Mr. Benjumen's medical

records and past psychological evaluations, results on multiple tests he gave to Mr. Benjumen, a

test application, a six and a half hour interview, as well as twenty years of experience. (Johnson

Tr., 111:17-20; 157:3-11.) Dr. Johnson explained that a full vocational evaluation, which takes

several weeks to perform, would not be helpful in connection with the opinion he offered

regarding Mr. Benjumen's ability to find work, given his age and level of functioning.  (Johnson

Tr., 111:23-25; 112:1-24).

The Defendants argue that Dr. Johnson's opinion lacks reliability because Dr. Johnson

did not examine local employment conditions, assess other types of employment that might be

available to the Plaintiff, and reference the U.S. Department of Labor's Dictionary of

Occupational Titles.  In support of their contention, the Defendants cite Jones v. UPS, Inc., No.

06-cv-2143-JPO, 2008 U.S. Dist. LEXIS 13215 (D. Kan. Aug. 18, 2008) and Elcock, 233 F.3d

734, neither of which, if followed, would require the exclusion of Dr. Johnson's testimony in this

case.  Rather, the courts in these cases note that the vocational rehabilitation counselors whose

expert testimony was offered had performed one or more of these tasks.  Jones, 2008 U.S. Dist.

LEXIS 13215 at *5 (certified rehabilitation counselor "used various resources to determine

available jobs"); Elcock, 233 F. 3d at 747 (vocational rehabilitation counselor assessed jobs in

the local market and noted that the Dictionary of Occupational Titles is a standard resource in

the field).

In any event, under the standard articulated by the Second Circuit, admission of Dr.

Johnson's expert opinion is appropriate.  "The Second Circuit has adopted a rather broad

standard for the admissibility of expert witness testimony."  Bacardi, 2000 U.S. Dist. LEXIS

3547 at *6.

> Although expert testimony should be excluded if it is
> speculative or conjectural, or if it is based on assumptions
> that are so unrealistic and contradictory as to suggest bad
> faith, or to be in essence an apples and oranges comparison,
> other contentions that the assumptions are unfounded go to
> the weight, not the admissibility, of the testimony.

Id. (quoting Boucher v. United States Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996);

McCullock, 61 F.3d at 1044 ("Disputes as to the strength of [an expert's] credentials, faults in

his use of different etiology as a methodology, or lack of textual authority for his opinion, go to

the weight, not the admissibility of his testimony.").

At trial, the Defendants may challenge any purported deficiencies in Dr. Johnson's

testimony through "[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof[,] [which] are the traditional and appropriate means of

attacking shaky but admissible evidence." Daubert, 509 U.S. at 596; McCullock, 61 F.3d at

1044. The "role as gatekeeper is not intended to serve as a replacement for the adversary

system." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 562

(S.D.N.Y. 2007) (quoting United States v. 14.38 Acres of Land, 80 F.3d 1074, 1078 (5th Cir.

1996); Amorgianos, 303 F.3d at 267 ("our adversary system provides the necessary tools for

challenging reliable, albeit debatable, expert testimony"). Accordingly, the Defendants' motion

to exclude the testimony of Dr. Johnson is denied.

C. Social Security Disability

The Defendants point out that unlike the Plaintiff, the debtors in Nash, 446 F.3d 188, and

Burton v. Educ. Credit Mgmt. Corp. (In re Burton), 339 B.R. 856 (Bankr. E.D. Va. 2006), were

found to be eligible for disability benefits by the SSA, and nevertheless failed to satisfy the

second prong of the Brunner Test. They contend that the Plaintiff's bipolar disorder is not as

severe as the disabilities of the debtors in the cases cited by the Plaintiff, because those debtors

were also found to be disabled by the SSA, whereas the Plaintiff was not.

It is undisputed that the SSA denied Mr. Benjumen's claim for Social Security disability benefits.  However, the SSA's determination with respect to disability is not conclusive to establish that a debtor is not entitled to a discharge under under 523(a)(8).  See Hertzel v. Educ. Credit Mgmt Corp. (In re Hertzel), 329 B.R. 221, 229-230, (6th Cir. BAP 2005) (student loans discharged based on undue hardship despite SSA finding that Debtor with Multiple Sclerosis was not disabled); see also Congdon, 365 B.R. at 443-444 (court noting distinction between the definition of "disabled" in a SSA proceeding and the determination that the bankruptcy court must make for purposes of the second Brunner prong).

For all of these reasons, summary judgment is denied on the second prong of the Brunner Test.

### 2. The Third Brunner Prong - Good Faith

The third prong of the Brunner Test requires that the Plaintiff show that he made a good faith effort to repay his student loans.  Brunner, 831 F.2d at 396.  The good faith requirement "'encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control.'" Elmore v. Massachusetts Higher Educ. Assistance Corp. (In re Elmore), 230 B.R. 22, 27 (Bankr. D. Conn. 1999) (quoting Roberson, 999 F.2d 1132, 1136 (7th Cir. 1993).

In evaluating good faith, the court considers a number of factors regarding the Plaintiff's efforts to repay student loans.  These include the Plaintiff's actions to maximize his income and minimize his expenses,  Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner), 309 B.R. 405, 420 (Bankr. E.D.N.Y. 2004) (citing Elmore, 230 B.R. at 27), his loan repayment history, French v. NCO Fin. Sys. (In re French), 2006 Bankr. Lexis 2221, *19 (Bankr. S.D.N.Y. 2006), and

whether he has negotiated or enrolled in an alternative repayment plan. <u>Allen v. Am. Educ. Servs. (In re Allen)</u>, 324 B.R. 278, 281-282 (Bankr. W.D. Pa. 2005).  None of these factors alone is conclusive.  <u>See</u> <u>French</u>, 2006 Bankr. Lexis 2221 at *20-21 ("Failure to avail [oneself] of alternative repayment plans is not per se evidence of a lack of good faith, but it can be a significant factor pointing towards such a conclusion.") (citation omitted); <u>Allen</u>, 324 B.R. at 281 (finding that debtor's failure to obtain a forbearance and deferment is indicative of a lack of good faith, but not determinative); <u>Maulin v. Salliemae (In re Maulin)</u>, 190 B.R. 153, 156 (Bankr. W.D.N.Y. 1995) ("Relevant proof [of good faith] may, but need not necessarily include a history of some payment, the propitious use of deferments, and the energetic exploration of employment options.").

The Defendants contend that the Plaintiff cannot demonstrate good faith in repaying his student loans, based on his failure to maximize his income and minimize his expenses; his failure to make payments towards the loans over an extended period of time; and his failure to take advantage of alternative payment options prior to filing for bankruptcy, only six months after completing his course credits.

A. <u>The Plaintiff's efforts to maximize income and minimize expenses</u>

(i) <u>Maximizing Income</u>

The Defendants submit that the Plaintiff cannot demonstrate a good faith effort to repay under the <u>Brunner</u> Test, because the Plaintiff has not sought employment outside the teaching field, and because he voluntarily quit his substitute teaching position in 2006.  <u>Stern v. Educ. Res. Inst. Inc. (In re Stern)</u>, 288 B.R. 36, 42-43 (Bankr. N.D.N.Y. 2002) (finding that "[b]orrowers under the various guaranteed student loan programs are obligated to repay their

loans even if they are unable to obtain employment in their chosen field of study"); Pobiner, 309 B.R. at 421 (debtor did not demonstrate good faith effort to repay student loans in part because of his unwillingness to make necessary sacrifices to maximize his income). The Defendants contend that in the past, the Plaintiff worked as a parking attendant, demonstrating an ability to work outside the teaching field. The Defendants rely on Pobiner, where the court determined, based on testimony regarding the plaintiff's creativity and remodeling skills, that it was reasonable to assume that the plaintiff, a 43 year old man, could secure other employment, even if he could not continue his own contracting business. Id. at 421.

Mr. Benjumen testified that he sent job application letters and resumes to approximately 100 schools in and around New York City. (Benjumen Tr., 68:9-70:3.) He also applied, in 2007, to the NYCDOE to attend the Brooklyn Citywide Career Fair, as well as to Carney Sandoe & Associates, a search firm for independent schools, but was rejected by both. Mr. Benjumen argues that he cannot secure employment outside the teaching field because he lacks additional skills that would afford him any opportunities outside of teaching. He explained at his deposition that he had not applied to jobs outside the teaching field because his only other experience was as a parking lot attendant, and at age 64, he would not be likely to be hired for such a job. (Benjumen Tr. 70:9-13.) The sufficiency of Mr. Benjumen's efforts to secure employment, including whether he has additional skills to secure employment outside the teaching field, is a factual inquiry that cannot be decided here as a matter of law.

The Defendants further argue that by voluntarily quitting his position as a substitute teacher at Grady High School in 2006, the Plaintiff failed to maximize his income. This argument fails in the context of these summary judgment motions. Mr. Benjumen testified that

he quit his job because he "entered a crisis of depression" when he was notified that he would not graduate from the masters program at City College.  (Benjumen Tr. 43:7-25.)  He stated that he finished out the day on May 8, 2006, left his identification and school keys, and never returned.  (Benjumen Tr. 46:6-18.)  He also stated that he was frustrated by the lack of clarification provided to him about his status as a permanent teacher.  (Benjumen Tr. 45:3-18.)  He further testified that one month later, he checked himself into Coney Island Hospital.  (Benjumen Tr. 43:24-25.)  Although the Defendants argue that the fact that Mr. Benjumen voluntarily left this substitute teaching position shows his failure to make the requisite good faith effort to secure income to repay his student loans, these events could also be cited in support of Mr. Benjumen's position that his illness prevents him from holding a job.

(ii) Minimizing Expenses

The Defendants argue that the Plaintiff failed to minimize his expenses while he was in school, using portions of the funds for living expenses and making unnecessary expenditures.  Mr. Benjumen testified  that from 2000 to the present, he has experienced manic episodes in which he "feels like spending a lot of money and [is] king of the world," and that he has overspent on "many, many, many" occasions.  (Benjumen Tr. 77:19-20 & 97:14-17.)  The Defendants also cite the Plaintiff's statement in deposition testimony that he negotiated to buy a boat for $4,000, and that such a purchase was not consistent with minimizing expenses.  (Benjumen Tr. 96:21-25.)

The Plaintiff, however, explained that his attempt to purchase the boat took place during "one of those mania moods that I was affected by."  (Benjumen Tr. 96:25; 97:1.)  Moreover, the purchase of the boat never actually occurred.  (Benjumen Tr. 35:12-13.)  He also testified that

his overspending took place during manic episodes and consisted of credit card purchases for
"extra dinners, extra things": "[B]ecause my frugal living is at the minimum . . . . having taken
my wife for a dinner or myself for a dinner would be considered an over expense." (Benjumen
Tr. 97:18-25, 98:1-2.)

This Court cannot as a matter of law find that the Plaintiff acted in bad faith in his efforts
to repay his loans because of a failed attempt to purchase a boat during one of the manic phases
of his disorder. Nor can the Plaintiff's deposition testimony concerning unspecified
overspending provide a basis for summary judgment, in the absence of evidence of the
magnitude of the expenses and the circumstances under which they were incurred.

B. Loan repayment history

The Defendants argue that the Plaintiff's lack of good faith is evidenced by his failure to
make payments towards his school loans over an extended period of time. It is undisputed that
the Plaintiff made payments on his school loans from July, 2000 through May, 2006, when he
lost his job. The Plaintiff contends that he acted in good faith by making payments towards his
student loans when he had the money to do so. Whether or not the payments made by the Debtor
were sufficient to demonstrate good faith is a factual issue that cannot be determined on
summary judgment. "A debtor's good faith efforts to repay student loans must be interpreted in
light of his ability to pay." Waterson v. Pa. Higher Educ. Assistance Agency (In re Waterson),
2002 Bankr. LEXIS 1498, *24 (Bankr. E.D. Pa. Nov. 26 2002); Douglas v. Educ. Credit Mgmt.,
Corp. (In re Douglas), 366 B.R. 241, 261 (Bankr. M.D. Ga. 2007) (court declined to find a lack
of good faith based on the fact that the debtor only made nominal payments, stating "other
evidence should be considered"); Lebovitz v. Chase Manhattan bank (In re Lebovitz),  223 BR

265, 274 (Bankr. E.D.N.Y. 1998) (failure to make minimum payments does not preclude finding

of good faith where debtor lacked resources to pay) (citation omitted).

C. Efforts to negotiate or enroll in alternative repayment plan before filing for bankruptcy

The Defendants argue that the Plaintiff made no effort to seek alternative repayment

options before filing for bankruptcy less than six months after completing his credits at City

College.  (Benjumen Tr. 92-93.)   They note that invitations made by the Defendants to the

Plaintiff to participate in repayment plans, including the Income Contingent Repayment Plan

("ICRP") offered by the DOE, have been rejected.

While a debtor's failure to take advantage of alternative repayment plans may be a

significant factor in determining whether or not the debtor made a good faith effort to repay his

or her loans, "there is no per se rule that failure to agree to an [alternative repayment] plan

establishes bad faith."  Zook v. Edfinancial Corp., et al., 2009 Bankr. Lexis 788, *32 (Bankr.

D.D.C. 1997) (citations omitted); Allen, 324 B.R. at 282 (summary judgment denied where court

determined that debtor's failure to obtain a forbearance and deferment is indicative of a lack of

good faith, but not determinative).  Furthermore, whether a debtor should have explored more

options before filing for bankruptcy is a purely factual inquiry, which turns on the specific facts

of each case.  Waterson, 2002 Bankr. LEXIS 1498 at *29 (noting that the debtor, who filed for

bankruptcy only ten months after the loans came due, made an effort to repay the loan before

filing for bankruptcy).

Moreover, the Defendants' argument ignores the fact that, by enrolling in an alternative

repayment plan, Mr. Benjumen would incur a potentially nondischargeable tax obligation

pursuant to 11 U.S.C. § 523(a)(1), for the amounts forgiven under the repayment plan.  Allen,

324 B.R. at 281-282; <u>Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani)</u>, 311 B.R. 496, 508 (Bankr. N.D. Ill. 2004). "[This] potential for disastrous tax consequences is particularly acute with respect to student loan debtors who are at or near retirement age when they commence [an alternative repayment] plan." <u>Allen</u>, 324 B.R. at 282. Such is the case with the Plaintiff here. His refusal to take this risk does not establish, as a matter of law, that the Plaintiff has not acted in good faith in the repayment of his loans. <u>Id.</u>

Moreover, the bankruptcy court's duty to determine the dischargeability of a debtor's student loans has not been "delegated to nonjudicial entit[ies]" such as the Defendants. <u>Johnson v. Educ. Credit Mgmt. Corp. (In re Johnson)</u>, 299 B.R. 676, 682 (Bankr. M.D. Ga. 2003) ("If the [debtors'] willingness to participate in the ICRP were determinative of good faith, the careful reasoning and consideration the [c]ourt is required to give a Section 523(a)(8) analysis would be replaced by an administrative agency's formula that would attempt to account for the specific circumstances of individual debtors.").

In short, multiple issues of fact appear in the record precluding a finding of lack of good faith. Summary judgment is therefore inappropriate on this issue.

Conclusion

For the foregoing reasons, the Defendants motions for summary judgment are denied. A separate order shall issue herewith.

Dated: Brooklyn, New York
  July 20, 2009

        */s/Carla E. Craig*      
        CARLA E. CRAIG
        Chief United States Bankruptcy Judge